**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

I, Timothy R. Thibault, being duly sworn, depose and state as follows:

I.   **INTRODUCTION**

1.   From December 1996 to the present, I have been employed as a Special Agent with the FBI.  Before December 1996, I was employed as a Special Agent with the U.S. Air Force Office of Special Investigations for four years.  I am currently assigned to the FBI's Washington, D.C. Field Office (Northern Virginia Resident Agency), on a public corruption and government fraud squad located in Falls Church, Virginia.  I have received extensive and specialized training in the area of public corruption and government fraud investigations.  I have received a Masters Degree from The George Washington University in Legislative Affairs in 2005.  As a Special Agent, I have participated in numerous investigations involving bribery, false statements, mail fraud, wire fraud, and false claims to government agencies.  As a result of my involvement in these and other investigations, I have executed a number of search and arrest warrants.

II.  **REASON FOR AFFIDAVIT**

2.   Based on information obtained by me, including information relayed to me by other special agents of the FBI, and other sources to this investigation, there is probable cause to

believe that there is kept and concealed within the premises
known and described as:

      a.    1350 F Street, N.E., Washington, D.C., and any and
            all outbuildings, appurtenances, storage areas,
            locked containers, associated therewith and
            automobiles located thereon; and

      b.    1990 Blue Lincoln Town Car
            VIN: 1LNLM82F2LY706812
            Louisiana License Plate Number DUJ043, and any and
            all storage areas and locked containers,
            associated therewith and located thereon.

fruits, instrumentalities and evidence of violations of:  a)
Title 18, United States Code, Section 201 (bribery of a public
official; b) Title 18, United States Code, Sections 1343, 1346
and 1349 (wire fraud - deprivation of honest services); c) Title
18, United States Code, Sections 1343 and 1349 (wire fraud -
scheme defraud); d) Title 15, United States Code, Section 78dd-1,
et seq., (bribery of a foreign official); and  e) Title 18,
United States Code, Section 371, (conspiracy to commit bribery,
wire fraud, bribery of a foreign official).  The first location
to be searched is the Washington, D.C. residence of United States
Congressman William J. Jefferson, where Jefferson also works on
occasion.  The second location to be searched is Congressman
Jefferson's 1990 Blue Lincoln Town Car.

    3.  The two locations to be searched are described in more
detail in Schedule A to this affidavit.  The evidence to be
seized is described in Schedule B to this affidavit.

4.   The facts and information contained in this affidavit are based upon my personal knowledge and the investigation and observations of other officers and agents involved in the investigation.  All observations noted below that were not personally made by me were related to me by the persons who made such observations.  This affidavit contains information necessary to support probable cause for this application.  It is not intended to include each and every fact and matter observed by me or known to the government.

## III.  **THE INVESTIGATION**

5.   This investigation began in approximately March 2005, when Cooperating Witness ("CW"), approached the FBI and communicated CW's suspicion that CW had been a victim of a fraud and bribery scheme involving Vernon Jackson, Brett Pfeffer and United States Congressman William J. Jefferson.[1]  The CW suspected that these individuals conspired to defraud CW out of $3.5 million which CW paid to Vernon Jackson's Louisville, Kentucky company, iGate, Incorporated, the developer of a telecommunications technology for use on copper wires.  CW

---

[1]   CW is a person located in McLean, Virginia, who has been providing reliable and credible information to the FBI since March 2005.  In addition, the information provided by CW has been corroborated by consensually recorded conversations that CW has participated in at the direction of the FBI.  My statements below, summarizing CW's interactions with others involved in the various iGate business ventures prior to March 2005, are based on numerous interviews of CW by me and Special Agent Edward Cooper of the FBI.

related that the money was paid with the understanding that iGate would use it to reacquire the rights to the technology from another company that had already bought the rights to the technology from iGate.  According to CW, Jackson could not produce proof that those rights, which CW was to use for a business venture in Nigeria, had been reacquired as represented.  In addition, CW related to the FBI that Congressman Jefferson had asked CW for a percentage ownership interest in CW's Nigerian company (five to seven percent to be placed in the names of Congressman Jefferson's children) in exchange for his assistance in using his official acts to support the Nigerian business venture.

6.    The targets of this investigation include, but are not limited to the following:

a.    William J. Jefferson: was born on October 15, 1943,(61 years old) and is currently serving his eighth term in the United States House of Representatives, representing the 2nd District of Louisiana.  He is a member of the House Ways and Means Committee (sub-committee on Trade), the Congressional Africa Trade and Investment Caucus, the Congressional Black Caucus and the Congressional Caucus for Nigeria (hereinafter also referred to as the "Nigerian Caucus").  He is a graduate of Southern University AT&T College, Harvard Law School (JD), and Georgetown University (LLM - Tax).  Jefferson previously served

three terms as a member of the Louisiana State Senate.

      b.   <u>Vernon Jackson</u>: was born on July 6, 1952, and is the 53-year-old President and CEO of iGate, Incorporated ("iGate"), a telecommunications firm that touts its "Triple Play" technology, which enables audio, video, and data to be transmitted over copper wire.  IGate is headquartered in Louisville, Kentucky and has an office in Hackensack, New Jersey.

      c.   <u>Brett M. Pfeffer</u>: was born on June 5, 1968,(37 years old) and owns a consulting firm named OTN.  Since January 1, 2004, Pfeffer has been employed as the President of an investment firm owned by CW and located in McLean, Virginia.  In the mid-1990's, Pfeffer served on the congressional staff of William Jefferson in both his New Orleans and Washington, D.C. offices.  Pfeffer resides in Herndon, Virginia.

      d.   <u>Suleiman YahYah</u>: is the Chairman and Chief Executive Officer of Rosecom.Net, a Nigerian company that represents itself as the leading internet service provider in Abuja, Nigeria.

      7.   On June 8, 2005, United States District Judge T.S. Ellis, III, in the Eastern District of Virginia, entered an order authorizing the interception of wire communications, for a period of 30 days, over cellular telephone number (502)797-6765 (the "Target Telephone") listed in the name of Vernon Jackson with a billing address of 4404 Century Boulevard, Louisville,

Kentucky, 40299-5802.  On July 7, 2005, Judge Ellis entered an order authorizing the continued interception of wire communications over the Target Telephone for an additional 30 days.  Monitoring over the Target Telephone continues to date.[2]

## IV.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.    The facts and circumstances described below outline the probable cause that United States Congressman William J. Jefferson, acting in concert with the other targets, has sought, is currently seeking, and in some cases, has already accepted, financial backing and/or concealed payment(s) of equity interests in business ventures located in the United States, Nigeria and Ghana (things of value) in exchange for his undertaking of official act(s) as a United States Congressman while promoting the business interests of the targets, including Jefferson himself.

9.    Congressman Jefferson has in the recent past and is currently attempting to use his official position as a United States Congressman to commit official acts in promoting the sale of communications equipment and related services offered by

---

[2]    Throughout this affidavit, I refer to telephone calls intercepted from the Target Telephone and consensually recorded conversations involving CW and others.  With regard to the selected conversations presented here, several caveats apply. Summaries and quotations are preliminary and have been prepared by me or provided to me by other law enforcement agents: final transcripts have not yet been prepared.  As a result, it is possible that changes to the summaries and quotations may occur during the preparation of transcripts.

iGate, a U.S. communications firm seeking to provide communications, data transfer, media, internet and other services in Nigeria, Ghana and possibly other African Nations.[3]  In exchange for his official acts supporting the proposed business ventures, Congressman Jefferson has already received a 30% equity stake in a Nigerian company controlled by the CW.[4]  At Congressman Jefferson's direction, the stock representing this interest has been placed in the name of a Nigerian L.L.C. held by Jefferson's children.  A similar arrangement is currently being negotiated by Congressman Jefferson regarding the implementation of iGate products and services in Ghana, whereby Jefferson has exchanged, is currently exchanging and plans in the near future to exchange, his official acts for a 30% equity stake in a Ghanaian company also set up under the control of the CW and created for the sole purpose of marketing and distributing iGate's technology and services in Ghana.

     10.  The official acts performed by Congressman Jefferson in

---

[3] Evidence also suggests that approximately half of the $3.5 million payment made by the CW in 2004 to iGate to obtain the exclusive rights to iGate's technology was not used for the purpose represented, leaving CW's company and another company, which had also paid iGate for exclusive rights to its technology, with competing claims to the same rights.  In addition, recent information obtained during this investigation shows that iGate may be replaced by another company which would fulfill the same role in the business ventures in Nigeria and Ghana.

[4] The evidence reflects that the Nigerian company controlled by CW was created with the assistance of Congressman Jefferson and one of his daughters, also a lawyer.

exchange for his actual and/or solicited receipt of stock in these foreign entities, and other things of value include: communicating with both the President and Vice President of Nigeria in an effort to secure the iGate business venture there; sending an official letter to the Nigerian Vice President seeking his assistance in overcoming opposition to the iGate business venture from the government-owned Nigerian telephone company; introducing CW to officials at the Export-Import Bank of the United States to assist CW in obtaining loan guarantees for the Nigerian and Ghanaian business ventures; writing an official letter to the Vice President of Ghana to obtain approval of the business venture in that country; traveling to Ghana, paid for by CW, to meet with high-ranking government officials such as the Vice President, the Minister of Communications, and others to further obtain approval to conduct the business venture there; using his congressional staff to plan the trip to Ghana and to obtain travel documents for the individuals making the trip with him; and communicating with the U.S. Embassy and the U.S. Ambassador to Ghana about the trip and scheduling of his meetings with Ghanaian government officials.

11.    In addition, Congressman Jefferson has solicited and continues to solicit CW for substantial amounts of capital to be used by Jefferson in his efforts to take control of iGate from Vernon Jackson (or replace iGate with a successor company)

-8-

through the use of a nominee company Jefferson directs through his children. This financing, of up to $3 million, was proposed by Jefferson and is to be provided in exchange for official acts by Congressman Jefferson as he promotes the business ventures in Nigeria, Ghana and perhaps elsewhere in Africa.

12. Finally, Congressman Jefferson has also discussed, with CW and others, the payment of bribes to high-ranking foreign government officials to promote the business ventures in Africa. With regard to the Nigerian business venture, Jefferson has discussed the making of payments to high-ranking government officials there, including the Vice President of Nigeria. Congressman Jefferson met with the Vice President of Nigeria on July 18, 2005, in Potomac, Maryland. According to Congressman Jefferson, the Vice President of Nigeria agreed to help secure the necessary approvals for the participants in the Nigerian business venture (iGate, CW's Nigerian company and a Nigerian partner) to commence operations in Nigeria in exchange for at least 50% of the profits planned to be received by CW's Nigerian partner. In addition, Congressman Jefferson has discussed with CW the payment of a substantial monetary sum by CW to the Vice President of Nigeria (in the range of up to $500,000) before the commencement of business operations in Nigeria. Congressman Jefferson and CW have discussed and continue to discuss the manner in which that payment should be made. Most recently,

Congressman Jefferson met CW at the Ritz-Carlton Pentagon City in Arlington, Virginia on Saturday, July 30, 2005.  While at the meeting, CW gave Congressman Jefferson $100,000 cash concealed in a leather briefcase for the sole purpose that it would be forwarded to the Vice President of Nigeria by Jefferson in exchange for the Vice President's assistance in securing the appropriate approvals to ensure the success of the Nigerian business venture.

V.   **STATEMENT OF PROBABLE CAUSE**

   A.   **JUNE 2004 - CW SEEKS INVESTMENT OPPORTUNITIES**

   13.   CW has founded and operates an educational technology philanthropic foundation, located in McLean, Virginia, whose mission is to provide technology to public schools nationwide. To help finance this philanthropy, CW hired Brett Pfeffer, a former aide to Congressman Jefferson, to seek out various investment opportunities on CW's behalf.

   14.   In June 2004, Pfeffer introduced Congressman Jefferson to CW over lunch in New Orleans, Louisiana.  At that meeting, Jefferson described a telecommunications company called iGate, and the fact that iGate needed an investor for a business venture it was attempting to secure in Nigeria.  Jefferson described the opportunity as "a deal you can't refuse."  Later, after Jefferson left the meeting, Pfeffer told CW that if Jefferson helped them to secure a good business opportunity, then Jefferson would

expect to get something out of it.

**B.   THE IGATE DEAL IS PRESENTED TO CW**

15.   From June 2004 through February 2005, CW participated
in a number of meetings in Northern Virginia, Washington, D.C.,
and New Orleans, LA, where the terms of the proposed iGate deal
were presented and discussed.[5]  During one such meeting, which
took place on June 25, 2004, in Congressman Jefferson's office on
Capitol Hill, Jefferson introduced CW to Jackson and vouched for
Jackson, indicating that their relationship was a long-standing
one and that Jackson was a reputable businessman.

16.   Jackson told CW that he had previously worked at Bell
Laboratories where he had created a technology called Triple
Play, which enabled data, video, and voice transmissions over
copper wire.  Jackson told CW that he had secured an agreement
from Bell Laboratories enabling him to market Triple Play outside
of the company and had set up iGate to do so.  According to CW,
Jefferson said that, as a member of the Congressional Black
Caucus and as head of the Nigerian Caucus in Congress, his point
of contact in Nigeria was the President of the country.  At
Jefferson's request, CW described CW's history and expressed an
interest in investment opportunities in Nigeria.

---

[5] Statements and/or events depicted in this affidavit that
occurred before March 17, 2005 are based substantially upon
debriefings of CW by agents of the FBI.  No statements and/or
events that occurred before March 17, 2005 were recorded by the
FBI.

17.   During the June 25, 2004 meeting, a power point presentation entitled "Nigeria Financial Connection" was reviewed and discussed.  The meeting was controlled and managed by Jefferson.  Jefferson and Jackson proposed that CW invest in iGate's Nigeria project.  They told CW that the Nigerian government was building the backbone of a nationwide telecommunications network.  Igate's Triple Play technology was described as the vehicle to provide data, video, and voice transmission service to individual subscribers throughout Nigeria.  Jefferson said that the Nigerian project would cost a total of approximately $45 million.  Jefferson told CW that CW could make an initial investment and the remainder could be financed.

18.   Shortly after that meeting, Pfeffer presented a term sheet to CW for the iGate deal he said had been forwarded to him by Jackson.  CW has provided a copy of this document to the FBI and I have reviewed it.  The term sheet called for CW to pay iGate $44,934,400 for the exclusive right to use iGate's patented Triple Play technology and equipment to support the project.  CW would pay iGate $3.5 million in cash up front and then finance the balance with a loan to be acquired via the Export-Import Bank of the United States ("Ex-Im Bank"), a federal agency whose mission is to assist in the financing of companies exporting goods from the United States to foreign countries.  CW signed the

agreement, and, subsequently, approved two wire transfers of funds to iGate from CW's account at the Bank of America branch located in McLean, Virginia: $1.5 million on July 22, 2004, and $2 million on September 20, 2004. It was CW's understanding that this money would be forwarded to an entity called "NDTV" (a Nigerian telecommunications company) to secure the rights to distribute iGate's Triple Play technology in Nigeria. I have reviewed the bank records of iGate at Regional Bank located in Indiana, which were obtained pursuant to a grand jury subpoena. Those records reveal that iGate has apparently forwarded to NDTV only $1.75 million of CW's $3.5 million total payment. The remaining $1.75 million appears to have been spent by Jackson for other purposes.

19. In August 2004, Congressman Jefferson introduced CW to a Nigerian named Suleiman YahYah, a representative of Rosecom, a Nigerian telecommunications firm. Jefferson told CW that CW would have to form a Nigerian company to participate in the iGate deal and that Rosecom was going to be a partner in the deal with CW's Nigerian company.

20. Jefferson also told CW that Jamilia Jefferson, Jefferson's daughter, must be retained by CW to do the legal work for the iGate deal, which included assisting in the formation of CW's Nigerian company, now known to me as "W2-IBBS, Limited." CW agreed to do so and in the next few months paid Jamilia

Jefferson's law firm thousands of dollars for legal work.

**C.    JEFFERSON SOLICITS CW FOR A PERCENTAGE OWNERSHIP IN THE NIGERIAN COMPANY**

21.   In December 2004, Jefferson and CW had lunch in the Congressional dining room and Jefferson discussed the iGate deal. He told CW that he knew Pfeffer had mentioned to CW that he, Jefferson, would be asking for something in return for his help in the iGate deal.  Jefferson then told CW that he wanted CW to give five to seven percent of the ownership of CW's Nigerian company to his five daughters, to be split equally among them.

**D.    FRICTION BETWEEN CW AND PFEFFER AND JACKSON**

22.   During the winter of 2004-2005, CW sought more information about Pfeffer's business dealings on CW's behalf.  CW came to believe that Pfeffer had forged CW's signature on some documents and that other important documents were missing.  In addition, CW came across what CW believed to be evidence that large expenditures were being made by Pfeffer, from CW's company bank accounts, without CW's authorization.  As a result, CW also began to have misgivings about CW's involvement in the iGate deal.

23.   In February 2005, CW began to ask Jackson questions about iGate's finances and requested verification that CW's previous investment of $3.5 million had been used to acquire the rights to iGate's Triple Play technology in Nigeria, as was previously represented to CW by Jackson.  Jackson refused and CW

-14-

broke off ties with him.  Suspecting that CW may have been
defrauded by Jackson and Pfeffer, among others, CW then
furloughed Pfeffer from CW's employment and did not respond to
email inquiries from Jefferson and Jackson.  I am in possession
of an email sent by Jackson to CW's attorney on February 4, 2005
in which Jackson expressed his displeasure with being unable to
contact CW.  Among other things, Jackson wrote in the email:

> I have been in constant discussions with the Nigerian
> partner, Rosecom, and there are several matters which
> need to be discussed with [CW].  *In addition, I have*
> *requested the assistance of US Congressman, William*
> *Jefferson; in terms of accompanying me on a trip to*
> *Nigeria in an effort to support the iGate-W2-IBBS*
> *efforts from a US-African Trade perspective, as we*
> *finalized business discussions*.(emphasis added).

### E.   CW CONTACTS THE FBI - BEGINS RECORDING CONVERSATIONS

24.   In March 2005, CW contacted the FBI and provided
details of the events that had transpired over the preceding nine
months regarding the iGate deal and CW's interactions with
Jefferson, Pfeffer, Jackson and others.  CW agreed to assist the
FBI in gathering additional information about the alleged
criminal activities by recording conversations with Jackson,
Jefferson, and Pfeffer over the telephone and in face-to-face
meetings.  All of CW's conversations after March 2005 and
described below were consensually recorded and have been reviewed
by me and/or Special Agent Edward Cooper.

25.   On March 31, 2005, CW, acting at the direction of the
FBI, met with Pfeffer under the guise of restoring the iGate and

-15-

EIM deals that Pfeffer had set up.[6]  The two met at the Ritz-
Carlton Hotel in Tysons Corner, Virginia.  At the meeting,
Pfeffer expressed dismay that the delays by CW may have upset
Jackson and Jefferson and hurt the business deals.  However,
Pfeffer thought they could still count on Jefferson's help with
the business deals.  Then CW and Pfeffer discussed what Jefferson
expected in return for the iGate deal:

> Pfeffer:   Can he (Congressman Jefferson) help me and you out
>            on other opportunities?  Of course he can.  That's
>            why he's doing what he's doing.  He ain't
>            traveling to Middle East just to see other things.
>            He's going over there to set up other business
>            deals, you know. That's the bottom line.  That's
>            what he does.
>
> CW:        That's part of his job, though, too, kind of like,
>            you know.  I mean, at least in Nigeria, I mean.  I
>            don't know about the Middle East.
>
> Pfeffer:   That's why . . . I mean, he would want a piece of
>            EIM if something happens. You know he ain't going
>            over there to be nice to me and Bruce (Bruce
>            Lyman, President of EIM).
>
> CW:        What do you think he would want?
>
> Pfeffer:   You'd probably have to put his brother-in-law on
>            the payroll, or something.  I don't know.  I mean,
>            who knows?  You know, Bruce says we'll take care
>            of him anyway we have to take care of him.  I mean
>            he won't ask for anything crazy.  He knows....
>            He's a businessman.

26.  At the conclusion of the March 31, 2005 meeting,
Pfeffer told CW that he would contact Jefferson as soon as

---

[6] In August 2004, Pfeffer led CW to invest approximately
$3.2 million in another company called EIM, which, at the time,
CW also expected Congressman Jefferson to promote.

possible to assess his willingness to continue assisting Pfeffer and CW.  About one hour after the meeting, Pfeffer called CW and left a voicemail saying he had just spoken to the Congressman and that the Congressman had expressed a willingness to move forward on the deals.

**F.    THE IGATE-CW NIGERIAN VENTURE IS BACK UP AND RUNNING**

27.  Over the next several weeks, CW, Pfeffer, and Congressman Jefferson had numerous communications about getting the iGate deal established and operating in Nigeria.  Congressman Jefferson and Pfeffer also told CW that they had communications with Jackson, whose relationship with CW at the time was, and is still today strained.

28.  On April 12, 2005, CW, Pfeffer and Congressman Jefferson met over dinner and discussed the iGate deal in Washington, D.C.  During this meeting, Congressman Jefferson explained the plan to obtain financing through the Ex-Im Bank to help finance the iGate deal.  During the meeting, CW asked Jefferson how long he planned to stay in Congress.  He replied: "I'm gonna get your deal out of the way . . . and I probably won't last long after that."

29.  On April 27, 2005, CW met Congressman Jefferson for dinner at a restaurant in Tysons Corner, Virginia.  During the conversation, the Congressman reiterated to CW how the Nigerian iGate project would unfold, even estimating the amount of revenue

the project would generate per month.  He talked again about how CW's Nigerian company would have to form a joint venture with Rosecom and Nitel, the Nigerian government-owned telephone company.

30.  Congressman Jefferson then mentioned that the Vice President of Nigeria (not further identified) was scheduled to arrive in Washington, D.C. on May 1, 2005.  He went on to describe the Vice President as a businessman who has "more deals going than the goddamn man in the moon."  Jefferson then said, "He's a very, well, the word might be...corrupt."  At this point CW asked Jefferson whether he had talked to him about the iGate deal and Jefferson responded, "He thinks it's great.  He can easily be involved in this."  Then, Jefferson described a role the Vice President could play in the iGate project in Nigeria:

> All we are talking about here is someone who will go to Nitel and say, look, do one of two things, partner with these guys (CW's Nigerian company and Rosecom) or let them lease your lines.  For a reasonable figure.  You know, ten bucks... per customer, or something.  Five bucks, seven bucks a customer.  Something like that.

31.  On May 4, 2005, Congressman Jefferson spoke with CW over the telephone and informed CW that Suleiman YahYah, the President of Rosecom, was in the United States and had spoken with the Congressman.  According to Jefferson, YahYah told him the Nigerian iGate deal was progressing nicely.  Jefferson went on to tell CW that Jefferson would not seek the Vice President's help unless Suleiman YahYah was unable to work out an agreement

with Nitel on the deal in Nigeria:

> JEFFERSON:     But when I heard from YahYah, we figured we
>                didn't need to talk to him (the Vice
>                President of Nigeria) unless we find out we
>                need that level of political help.... See, if
>                YahYah can work the deal out with Nitel, we
>                don't need to talk to anybody.
>
> CW:            I see.
>
> JEFFERSON:     And it's better not to bring all those hands
>                into the pot if we don't need to.
>
> CW:            I agree.  And it complicates matters, too,
>                though.
>
> JEFFERSON:     If there's a need for that, I can always see
>                him when I go to Nigeria.
>
> CW:            OK. OK.
>
> JEFFERSON:     He'll grant me an audience if I need to see
>                him. OK?
>
> CW:            Sounds good.

32.  On May 12, 2005, CW met Congressman Jefferson for
dinner in Washington, D.C.  Jefferson discussed the Nigerian
iGate deal in great detail, focusing on significant changes in
the deal which had been agreed upon by YahYah and Jackson during
a previously held strategy session in Louisville, Kentucky.
Congressman Jefferson then talked about how he and Jackson had
pitched the iGate deal to YahYah and the Nigerian Communications
Commission in Nigeria during a previous trip there:

> . . . so I took him [YahYah] over to Vernon's place
> where I showed him some stuff [iGate technology].  Then
> he went over and started writing back about specifics
> about the technology. . .(unintelligible).  And then by
> and by, we made this trip over there and we made, we

took this stuff with us and demonstrated it to the Nigerian Communications Commission, Nitel, all of 'em.

33.  Later, during the same conversation, Jefferson told CW that YahYah's role in the iGate deal may include paying bribes to various officials in Nigeria:

> JEFFERSON:     ...But we need him (YahYah).  We got to motivate him really good.  He's got a lot of folks to pay off.  In his mind, he's gotta...he'll tell me I've got to give the Minister something (unintelligible).  I'll say I don't want to know about that. Whatever you gotta do, you do.  We don't want to hear about the Minister.  All the stuff you got to pay the local people, that's your business.

> CW:     He's worried about the local market.  And that's his thing and that's his job.

> JEFFERSON:     That's right.  He's gotta, if he's gotta pay Minister X, we don't want to know.  It's not our deal.  We're not paying Minister X a damn thing.  That's all, you know, international fraud crap.  We're not doing that.  We're not doing any of that gets us (Unintelligible). Whatever they do locally, that's their business.

34.  As the May 12, 2005, dinner continued, Jefferson proposed significant changes in the distribution of profits from the iGate deal.  Jefferson negotiated with CW a larger share of the profits from the iGate deal for Jefferson's own children.  As they discussed the issue, CW and Jefferson were writing notes to each other on a piece of paper at the table.[7]  Jefferson wrote

---

[7] CW has provided to the FBI originals of the documents and handwritten notes referred to during this recorded conversation. I have reviewed these materials.

"c" on the paper and then, adjacent to that letter he wrote "18 -
20."  As he wrote, Jefferson said, "The old deal was at seven
percent," referring to his original solicitation of five to seven
percent of the shares of CW's Nigerian company for his five
daughters back in December 2004.  After writing on the paper for
a few moments in silence and then showing his writings to CW, the
conversation then continued:

| | |
|---|---|
| JEFFERSON: | Does that make any sense to you? |
| CW: | Uh huh.  I understand what you're saying. That's the big picture.  I see.... What's this say? |
| JEFFERSON: | That's, this (unintelligible), the "c" is like for "children." |
| CW: | Uh huh. |
| JEFFERSON: | I wouldn't show up in there. |
| CW: | Say that again.  I'm sorry. |
| JEFFERSON: | I make a deal for my children.  It wouldn't be me. |

35.  As they continued to write figures on the paper,
Congressman Jefferson began laughing and said, "All these damn
notes we're writing to each other as if we're talking, as if the
FBI is watching."

### G.  IGATE BROCHURE NOTES CONGRESSMAN JEFFERSON'S CONCEALED INTEREST - INDICATES JACKSON'S KNOWLEDGE

36.  On the evening of May 24, 2005, CW met for
approximately one hour with Congressman Jefferson over dinner in
Washington, D.C.  During the meeting, Jefferson gave a color

brochure to CW that had been created using iGate's logo and was labeled "W2-IBBS/Rosecom Broadband Project in Nigeria."  The brochure, which contained various financial projections for the iGate deal, appeared to have been produced by iGate and was labeled "confidential."  One part of the brochure contained a five-year earnings projection giving, by color-coded bar chart, the earnings projections for each person/entity involved in the iGate deal: "W2-IBBS, Rosecom, 3rd Party, and iGate."  According to the brochure, by the 5th year of operations, the Nigerian business venture was projected to have total annual combined earnings of over $200 million per year.  Congressman Jefferson talked with CW concerning each of the projections contained in the brochure.  When he got to the section on "3rd Party," Jefferson said to CW: "you can guess who that is."  CW understood Jefferson's statement to refer to Jefferson's concealed interest in the iGate deal.[8]

### F.  CW'S PAYMENT TO JEFFERSON IN EXCHANGE FOR OFFICIAL ACTS PROMOTING THE NIGERIAN BUSINESS VENTURE

37.  On June 8, 2005, CW met with Congressman Jefferson for dinner in Washington, D.C.  At the meeting, CW delivered a stock certificate to Jefferson, which amounted to a 30% equity stake in

---

[8]  Based on your affiant's knowledge of the facts of this investigation, your affiant can reasonably conclude that Jackson either created or at least, reviewed the iGate brochure discussed above - indicating that Jackson has knowledge of Congressman Jefferson's concealed interest in the Nigerian business venture.

CW's Nigerian company.[9]  CW's delivery of the stock certificate
to Jefferson was captured on video tape.  The certificate was
placed in the name of "Global Energy & Environmental Services,
LLC," ("Global") pursuant to Jefferson's request during previous
discussions with CW.[10]  CW further signed a joint venture
agreement between CW's Nigerian Company and Rosecom, which called
for CW to make an additional payment of $3.5 million to fund the
initial capital of the joint venture by July 22, 2005.  The joint
venture also detailed that the parties would obtain additional
financing through the Ex-Im Bank in the amount of $10.75 million
to further the business venture in Nigeria.

**H.    CONGRESSMAN JEFFERSON'S OFFICIAL ACTS IN SUPPORT OF THE
NIGERIAN BUSINESS VENTURE**

38.    Since June 8, 2005, Congressman Jefferson has continued
to promote the Nigerian business venture through official acts in
his capacity as a United States Congressman.

---

[9]  Over the course of their dealings, Congressman Jefferson
and CW have discussed different percentage amounts of stock in
CW's Nigerian company as well as different ways in which that
stock could be transferred. i.e., stock options and/or stock
certificate transfers.  By June 8, 2005, Congressman Jefferson
had agreed to receive a 30% interest in the stock of CW's
Nigerian company.

[10]  On May 31, 2005, Jefferson described Global as a Nigerian
company in the name of Jefferson's children which has been in
existence for the past two to three years.  Jefferson told CW
that his son-in-law runs Global and he suggested that another
son-in-law should be employed by the joint venture to run things
in Nigeria.

### 1. CONGRESSMAN JEFFERSON WRITES OFFICIAL LETTER TO THE VICE PRESIDENT OF NIGERIA

39. Beginning on approximately June 9, 2005, numerous conversations were intercepted over the Target Telephone revealing that a problem had arisen in Nigeria threatening the success of CW's and the other targets' business venture there. Specifically, the calls revealed that Nitel (the Nigerian government-owned telephone company) had ordered communications parts from a supplier other than iGate. The parts ordered would not work well with iGate's technology and threatened the ability of the business venture to operate in Nigeria. Suleiman YahYah, Vernon Jackson, and Byeong K. Son, an employee of iGate ("BK" or "Son"), were overheard on these various calls stating that the solution to the problem rested with Congressman Jefferson.

40. On June 9, 2005, a call was intercepted between Jackson and Suleiman YahYah. YahYah stated "I believe that now is the time for interceding with the VP (of Nigeria)." YahYah added that he was not making any progress and that they "need[ed] intervention on that high level." YahYah told Jackson that "we do not have an edge on that negotiation." Near the end of the conversation, YahYah stated: "to make clear, the Congressman, he has to move in and move in fast." I submit that YahYah was referring to the necessity that Congressman Jefferson use his influence with the Vice President of Nigeria so that the Vice President would cause Nitel to use iGate's products in Nigeria.

41.  On June 10, 2005, a call was intercepted between
Jackson and Congressman Jefferson.  Jackson told Jefferson that
he had spoken to YahYah the night before and indicated that
YahYah had met with "them" twice, met with the MD (Managing
Director of Nitel), and that he (YahYah) believed barring some
sort of input from the head of state level, "these guys" were
really set on pushing a new product that was being shipped in the
next month.  Jackson added that they were going "to play hell
getting our equipment co-located."  Congressman Jefferson advised
that he would try to call YahYah after he returned to his house.
Jefferson stated that "this guy is coming over here on the 18th
of July . . . I can see him then and talk to him then."
Jefferson added "it's very hard to talk over the phone with these
people about all these issues."

42.  On June 13, 2005, a call was intercepted between
Jackson and Suleiman YahYah.  Jackson told YahYah that he
believed Congressman Jefferson would call YahYah later that
night.  YahYah stated that Nitel was being run by contractors and
by the government.  Jackson asked whether YahYah felt that he
could get it done with the "proper political help."  YahYah
replied, "yes."  Jackson then said that in that case, he would
have him (Congressman Jefferson) "push on."

43.  On June 14, 2005, at approximately 12:12 p.m., a call
was intercepted between Congressman Jefferson and Jackson.

Jefferson informed Jackson that he had just spoken to YahYah, and YahYah had told Jefferson the same thing he had told Jackson, that "these folks need some more nudging."  Jefferson stated that YahYah had said "the Vice President's thing on the 18th was too late for him."  Jefferson stated that the Vice President does not want to talk over the telephone about all these details and wants to see Jefferson in person.  Jefferson stated that he thought he should write him (the Vice President) a letter and let his (the Vice President's) wife get the letter to him that explains the situation to see if he (the Vice President) can intervene and prepare things before he gets here.  Jefferson stated that the Vice President does not want to talk over the telephone about details like who does what and who owns what.

44.  On June 14, 2005, CW and Congressman Jefferson spoke over the telephone.  During the conversation, Jefferson spoke about the situation with the Vice President of Nigeria. Jefferson said that he planned to fax a letter to the Vice President's wife in Maryland hoping to pin down the Vice President for a meeting with him during the Vice President's July 18, 2005 trip to the United States.

45.  On June 29, 2005, Congressman Jefferson faxed to CW a copy of the letter he had written to the Vice President of Nigeria.  CW gave a copy of the letter to law enforcement and I have reviewed it.  The letter is dated June 21, 2005 and is

addressed to ". . . Vice President" at the address of the Nigerian Embassy in Washington, D.C.  The letter is unsigned and the signature block at the end of the letter provides "William J. Jefferson; Member of Congress."

46.  The letter begins with the greeting "Dear Mr. Vice President" and continues with "I wish to bring a project to your attention by which a U.S. Company desires to invest USD $50,000,000 to provide high speed internet service to Nigeria over Nitel's copper wire infrastructure."  The letter details the problems encountered by Nitel's decision to order products from a Chinese competitor to iGate and specifies why the iGate product would be superior.  Jefferson further wrote:

> From the point of view of U.S. business, it is very important to be able to rely on the acceptance of an offer as a deal if U.S. Investment is to be encouraged in Nigeria.  Thus it is important that Nitel recognize the acceptance by Rosecom, on behalf of itself and its U.S. partner, and permit them to launch their project in Nigeria as expected.

Congressman Jefferson closed the letter by stating:

> I hope you will be able to check into this matter with the Managing Director of Nitel prior to your trip to the U.S. in July 2005.  I look forward to having a chance to meet with you then to discuss or to conclude this matter at that time.

47.  Congressman Jefferson's letter failed to disclose a number of important facts concerning the business venture in Nigeria.  Most importantly, Jefferson made no reference to Jefferson's 30% interest in CW's Nigerian company, Rosecom's U.S.

partner referred to in the latter.  In addition, the letter made no reference to Jefferson's existing ownership of stock in iGate.[11]

### 2.    CONGRESSMAN JEFFERSON INTRODUCES CW TO EX-IM BANK OFFICIALS

48.    On June 20, 2005, CW met with Maureen Adu, a former Ex-Im Bank employee, for advice on how successfully to obtain loan guarantees for the Nigerian business venture.  Adu explained the application process at the Ex-Im Bank and suggested, among other things, that Congressman Jefferson could introduce CW to an Ex-Im Bank official.  Adu provided that "when a Congressman asks to come to Ex-Im Bank, it is a big deal.  It's a very big deal."

49.    On July 15, 2005, Congressman Jefferson, Brett Pfeffer, and CW met with J. Joseph Grandmaison, a member of the Board of Directors for Ex-Im Bank and John Richter, Regional Director for Asia, Africa, and the Middle East, Ex-Im Bank, to discuss the Ex-Im Bank's possible backing of CW's business ventures in Nigeria and Ghana.  The meeting was arranged by Congressman Jefferson. While at the meeting, Congressman Jefferson advocated for funding of the Nigerian business venture while keeping his 30% interest in CW's Nigerian company concealed.

---

[11]  As is discussed below, in June 2005, Congressman Jefferson disclosed to CW that he was already a part owner of iGate via a Louisiana LLC maintained in the name of his wife and children.

I.   **CW DELIVERS $100,000 IN CASH TO CONGRESSMAN JEFFERSON FOR FURTHER DELIVERY TO THE VICE PRESIDENT OF NIGERIA TO SECURE THE VICE PRESIDENT'S ASSISTANCE ON THE NIGERIAN BUSINESS VENTURE**

50.   During two separate and consensually recorded meetings between CW and Congressman Jefferson, one on June 8, 2005 and the other June 17, 2005, the possibility of paying a bribe to the Vice President of Nigeria and the specific means of making the bribe payment was discussed.  In sum, Congressman Jefferson told CW that the Vice President's wife currently lives in the United States (Maryland) and operates a foundation there.  Jefferson suggested that a payment to the Vice President could be made by way of a payment to the foundation.  Jefferson described to CW the manifest purpose of the foundation - to help Nigerian women - but later described it as a likely "front."

51.   In a July 12, 2005 meeting with CW, Congressman Jefferson related that the direction of the Nigerian business deal depended on obtaining assistance from the Vice President of Nigeria.  Congressman Jefferson explained he would request the Vice President to assist with two key issues related to the deployment of iGate technology in Nigeria:

a.   Assistance in extinguishing a $2 million debt with NDTV that relates to a previous NDTV procurement of rights to deploy iGate technology in Nigeria.

b.   Assistance in gaining Nitel's cooperation for the co-location of iGate technology at Nitel facilities.

-29-

52.  On July 18, 2005, Congressman Jefferson and CW traveled to Maryland to visit the Vice President of Nigeria and his wife. Upon arrival, Congressman Jefferson and the Vice President met privately for approximately one hour.  Later that same evening, Congressman Jefferson met with CW in Tysons Corner, Virginia and again on July 21, 2005.  Based on his private conversation with the Vice President of Nigeria, Jefferson explained to CW that the Vice President of Nigeria would be receiving up to 50% of the share of the profits expected to be earned through the iGate venture by Rosecom, CW's Nigerian partner.  Jefferson also explained that the Vice President had assured Congressman Jefferson that iGate's approximate $2 million debt to NDTV had already been extinguished as Jefferson had hoped.

53.  On July 21, 2005, Congressman Jefferson again met with CW to further discuss the business venture in Nigeria.  CW, looking for reassurance, had the following conversation with Jefferson:

CW:          Do we have a deal, you know, with, with, you
             know, the VP of Nigeria first?

Jefferson:   Uh, yes, we do have a deal with him.

CW:          Excellent, Okay.

54.  At that same meeting, Congressman Jefferson and CW discussed the possibility of a substantial cash payment to the Vice President of Nigeria on the "front end" of a monetary amount

in the range of $500,000.  CW later told Jefferson: "I think it's
good he has something on the front end, though, just as a
motivating factor.  So he doesn't forget what he's working for
(laughs)."  There was no audible response from Jefferson.  Then
CW stated: "That's good."

55.  On July 26, 2005, CW and Congressman Jefferson met
to further discuss the status of the Nigerian venture and the
possible takeover of iGate by Jefferson with the financial
backing of CW.  During this meeting, Jefferson advised that he
believed the Vice President of Nigeria was returning to Nigeria
on Monday, August 1st.  CW then stated:

> My thinking was . . . I don't know what your thoughts.
> . with sending him back . . . with a phrase I will
> never say again . . . I'll never write it again, I can
> say it . . . .

To this, Jefferson replied "Right.  To do that, he must have that
. . . ."  CW later reported that, as Jefferson spoke, he pointed
to a word he had written on a piece of paper on the table -
"Cash."  CW then asked, "What if we do a smaller amount in that
and then follow it with something that is wired?"  Jefferson
responded that money could be sent to Nigeria through an
investment in the stock market.  Shortly thereafter, CW stated,
"if it would help matters, I thought I could . . probably no more
than 100, you know, K, I could produce you know that word [cash,
according to CW] . . with a promise of what you're suggesting . .
. how about the two together?"  Congressman Jefferson replied,
"Good idea."  Jefferson also indicated that the CW needed to get

the money together by Saturday because he intended to deliver the letter to the Vice President on Saturday, July 30th.

56.  On July 30, 2005, Congressman Jefferson met CW at the Ritz-Carlton Pentagon City in Arlington, Virginia at approximately 8:30 a.m.  During the meeting, CW and Congressman Jefferson again spoke about the status of the Nigerian and Ghana business ventures and Jefferson's formation of a new company, Multimedia Broadband Services, Inc., which he intended to succeed iGate's role in the business ventures.  At the close of the meeting, CW and Congressman Jefferson stood before the open trunk of CW's car.  At that time, Congressman Jefferson reached in and removed a reddish-brown colored leather briefcase which contained $100,000 cash in denominations of $100 bills.  He placed the briefcase in a reddish-brown colored cloth bag, which contained the letters "BOSCA" imprinted on the side.  Jefferson then took the bag, containing the briefcase and the $100,000 in cash and placed it inside the passenger compartment of his 1990 Lincoln Town Car and drove off.  Congressman Jefferson's receipt of the briefcase containing $100,000 in cash was video taped by the FBI from several vantage points.[12]

--------

[12] CW and Congressman Jefferson met again this morning (August 1, 2005) at the Ritz-Carlton Pentagon City in Arlington, Virginia.  During this meeting, CW reported that CW asked Jefferson if the Vice President received the money.  Jefferson indicated that the Vice President had received it along with the letter addressed to Nitel on behalf of CW. This report is preliminary in nature as the debriefing of CW following

J.  **CONGRESSMAN JEFFERSON PROMOTES BUSINESS VENTURE IN GHANA**

57.  On May 31, 2005, CW met with Congressman Jefferson in Washington, D.C.  The conversation was consensually recorded.  Although the meeting focused on the operations of the Nigerian business venture and related issues, a part of the discussion turned to the topic of Ghana and possible opportunities for the same business ventures there.  CW asked Congressman Jefferson if they could take the same business model they had set up for Nigeria and apply the same approach to other places in Africa.  Congressman Jefferson agreed, saying that the next place they planned to go was Ghana and suggested that they could travel to Ghana in July 2005.

58.  During the meeting of June 8, 2005, previously discussed, CW signed a joint venture agreement committing CW's Nigerian company to a business venture with Rosecom, the Nigerian telecommunications firm.  By signing the joint venture agreement, CW was also committing to a multi-million dollar obligation to further the business venture.  When CW signed the agreement, CW told Jefferson, "I will sign this agreement if you give me your word that you will do your best to go to Ghana."  Jefferson assented and, at that moment, called the President of Ghana's

this meeting continues at the time of this writing.

son, Eddie Kufuor, on his cellular telephone and discussed arrangements for a July 5, 2005 trip to Ghana to further a similar business venture there involving internet and communications systems.

1.    **CONGRESSMAN JEFFERSON'S PLANNED BENEFIT FROM THE GHANAIAN BUSINESS VENTURE**

59.    On several occasions, Congressman Jefferson has discussed with CW the likelihood that the Ghana business venture would be set up in the same model as the Nigerian business venture, indicating that Jefferson will be receiving an equity interest (likely through his control of Global Energy & Environmental Services, LLC,) in a Ghanaian company set up for purposes of conducting the business venture in that country. During the July 21, 2005 meeting, CW asked Congressman Jefferson: "As far as Ghana goes, are you happy with the 30% in Ghana?" Jefferson responded in the affirmative.  When CW referred Jefferson to a piece of paper noting the breakdown of percentages of equity shares in the Ghanaian company, Jefferson  pointed to CW's reference of "WJ 30%," scratched out "WJ" and wrote in "Global."

2.    **CONGRESSMAN JEFFERSON'S OFFICIAL ACTS IN FURTHERANCE OF THE GHANAIAN BUSINESS VENTURE**

60.    The intercepted calls from the Target Telephone and consensually recorded conversations between Congressman Jefferson and CW reflect the official acts Congressman Jefferson has

-34-

undertaken and is currently undertaking to secure a telecommunications business venture in Ghana.  These official actions include: writing an official letter to the Vice President of Ghana to obtain approval of the business venture in that country; traveling to Ghana, paid for by CW, to meet with high-ranking government officials such as the Vice President, the Minister of Communications, and others to further obtain approval to conduct the business venture there; using his congressional staff to plan the trip to Ghana and to obtain travel documents for the individuals making the trip with him; and communicating with the U.S. Embassy and the U.S. Ambassador to Ghana about the trip and scheduling of his meetings with Ghanaian government officials.

61.  At approximately 11:00 a.m. on Wednesday, June 22, 2005, Congressman Jefferson called CW at CW's home in McLean, Virginia.  During the call, Jefferson spoke, among other things, about the upcoming trip to Ghana.  Jefferson told CW that he had written a letter to the Ambassador of Ghana requesting the meetings that he wanted to set up while there.  Jefferson also told CW that he had consulted with Byeong K. Son ("Son" or "BK"), the Chief Engineer for iGate and asked him to prepare a list of things they would need from the government in Ghana for CW and iGate to successfully operate a telecommunications venture there. Jefferson then told CW "once the government agrees, it's a

private deal between local companies and you [CW]. . . basically."

62.  At approximately 8:30 a.m. on Friday, June 24, 2005, Jefferson and CW met at a restaurant in Washington, D.C.  During the meeting, Jefferson discussed with CW the expected itinerary for the upcoming trip to Ghana and the fact that Jefferson might depart early once all of the "official stuff" was completed. Jefferson shared with CW that he had written a letter to the Ambassador of Ghana and that he would call the Ambassador later that day.  Jefferson indicated to CW that he told the Ambassador that he wanted to meet with the President of Ghana, the Minister of Communications, the Director of Ghana Telecom, and "any other official in the chain. . . "

63.  On June 30, 2005, CW met with Congressman Jefferson in Washington, D.C.  During the meeting, Jefferson disclosed that Eddie Kufuor, the President of Ghana's son, had arranged for a meeting with the Vice President of Ghana and other government officials.  Jefferson told CW that he was going to send a letter to the Vice President in advance of the meeting to explain what they [iGate and CW] were trying to accomplish during the trip. Jefferson said that each of the government planners were being written a letter as well.  "BK is writing to lower level people . . . I only wrote to the Vice President."  Jefferson further stated that he would also make contact with U.S. Embassy

personnel in Ghana to check the scheduling with them.  Jefferson also explained that Eddie Kufuor would introduce them to a Ghanaian barrister who would help them form a Ghanaian company with the plan to have the same general structure as CW's Nigerian Company in the Nigerian joint venture.

64.  On June 30, 2005, Jackson received an incoming call from Byeong K. Son.  Son stated that he believed Jefferson's office is in contact with the Ghana government and the Ghana telecom company.  Son informed Jackson that Congressman Jefferson's secretary had e-mailed Son a letter addressed to the Chairman of Ghana telecom for Son's signature.

65.  On July 1, 2005, CW received a letter by facsimile from Congressman Jefferson.  CW has given a copy of the letter to law enforcement and I have reviewed the document.  The letter, written on "House of Representatives" letterhead, is dated June 29, 2005 and is addressed to " . . . Vice President; The Republic of Ghana; Accra, Ghana."  The letter also appears to have the signature of William Jefferson above the typewritten words, "William J. Jefferson; Member of Congress."  The letter described the then upcoming trip to Ghana and the business venture being sought there.  It provides:

> *I am leading a delegation of six Americans to Ghana to pursue the establishment of a project to provide real broadband, or high speed internet services over the existing copper wire infra-structure of Ghana Telecom.* We will be in Ghana from July 5th - July 11th.  The project will involve the investment of approximately

USD $25,000,000 over the next five (5) years and the payment of substantial fees per subscriber for the use of the copper wire infrastructure of Ghana Telecom. (Emphasis added).

*The establishment of the project in Ghana depends principally upon the decisions of the appropriate Ghanaian authorities*, including the Executive Offices of the Presidency, the Minister of Communications, Ghana Telecommunications Company, and the Ghana National Communications Authority. (Emphasis added).

66. Congressman Jefferson did not disclose in the letter that he was already a holder of shares of iGate and that he would be receiving an equity interest in a Ghanaian company to be set up for the purpose of establishing the business venture in Ghana.

67. Based upon my knowledge of the facts of this investigation, the continuing conversations between CW and Congressman Jefferson and the calls intercepted over the Target Telephone, I have knowledge that on July 4, 2005, the following persons departed for Ghana: Congressman Jefferson; Tory Bullock, Congressman Jefferson's son-in-law; Angelle Kwemo, Congressman Jefferson's Legislative Assistant; Brett Pfeffer; Eddie Kufuor (son of the President of Ghana); and Byeong K. Son.

68. Between July 5, 2005 and July 10, 2005, CW received a series of verbal and written reports from Brett Pfeffer pertaining to the progress of the Ghana trip. According to Pfeffer, Congressman Jefferson met with, among others, American Embassy officials, the Vice President of Ghana, the Minister and Deputy Minister of Communications for Ghana, the Chairman of the

National Communications Authority, a Ghanaian agency responsible for regulating the telecommunications industry, the Ghanaian Minister of Energy, and the Chief Executive Officer of Ghana Telecom, which is a quasi-governmental agency, owned 70% by the Ghanaian Government and 30% by a private business entity.

69.  On July 12, 2005, after returning from Ghana, Congressman Jefferson met with CW and reviewed the steps he had taken to further the business venture in Ghana.  Jefferson told CW that the name of CW's company, which had been formed in Ghana, was "International Broad Band Services" ("IBBS").

### K.  CONGRESSMAN JEFFERSON REQUESTS CW TO FINANCE HIS TAKEOVER OF IGATE

70.  Many of the initial calls intercepted to and from Jackson on the Target Telephone revealed iGate was a company in serious financial debt and totally dependent upon an expected cash influx from the CW.  Calls to and from the Target Telephone show numerous creditors being kept at bay by Jackson.  As a result of the financial pressure on iGate, Jackson was becoming increasingly hostile towards CW, who had not relented to any of Jackson's ultimatums for expedited financing.

71.  Jackson's hostility towards CW began to cause friction between Jackson and Congressman Jefferson, who appeared to believe Jackson's instability was a threat to the future success of iGate business ventures.  During the June 8, 2005 meeting discussed above, Jefferson told CW: "<u>I'm not gonna let him</u>

[Jackson] let me use my good offices, whatever they are, and then
to make arrangements and then blow it out. I'm not gonna do
that" (Emphasis added).

72. At a consensually recorded meeting in Washington, D.C.
between CW and Jefferson on Friday, June 17, 2005, Jefferson
proposed a plan to rescue iGate from its financial straits by
purchasing a controlling interest in iGate by way of another
company - ANJ, a Louisiana company controlled by Jefferson and
kept ostensibly in the name of his wife and children.[13]
Jefferson stated that ANJ was already a part owner of iGate. To
further his plan, Jefferson proposed that CW finance his takeover
of iGate with a multi-million dollar loan to be used to satisfy
iGate's $5 million to $7 million debt and to further fund the
investments in Nigeria and Ghana.[14] Jefferson explained to CW
that such a takeover would allow Jefferson the opportunity to
install several confidants on iGate's board of directors and
allow Jefferson to control iGate, relegating Jackson to the
status of an employee of iGate.

---

[13] Law enforcement agents have separately learned that "The
ANJ Group, LLC" is an active Louisiana Limited Liability Company
that was registered on January 19, 2001 and whose registered
agent is Jack D. Swetland with an address of 650 Poydras Street,
Suite 2245, New Orleans, Louisiana 70130.

[14] As is discussed above, Jefferson sought $3 million in
financial backing from CW for the takeover of iGate because he
believed he could satisfy creditors of over $5 million to $7
million of iGate's debt for a steep discount in the area of 50%.

73.   On June 24, 2005, CW met with Jefferson and they later
spoke over the telephone about Jefferson's proposal for CW to
finance his takeover of iGate, among other things.   During the
telephone conversation, CW expressed a willingness financially to
support Jefferson's effort to take control of iGate, provided he
gave his best efforts at furthering key components of the
Nigerian and Ghanaian business ventures.   Jefferson stated "<u>I
will give it a thousand percent, as you might imagine.  I'm gonna
try my best to deliver for you and not disappoint you.</u>" (Emphasis
added).[15]

74.   During CW's July 12, 2005 meeting with Congressman
Jefferson, Jefferson discussed the possible composition of
iGate's Board of Directors after it had been restructured.
Congressman Jefferson indicated the members of this board should
include CW; Dale (last name unknown); an individual with
investment banking experience; Jamila, on of the Congressman's
daughters; Vernon Jackson; and Norbert Simmons, a New Orleans

---

[15]   At the request of Congressman Jefferson, CW has wired
cash payments from CW's Virginia bank to a bank account in the
name of The ANJ Group, LLC at Dryades Savings Bank in New
Orleans, LA on or about June 22, 2005 ($59,225.18) and July 1,
2005 ($30,000).   These payments were made for the purpose of
assisting Congressman Jefferson with his takeover of iGate and
are among the things of value Jefferson has received in exchange
for his official acts supporting the business ventures in Nigeria
and Ghana.  All cash payments made by CW, at Congressman
Jefferson's request after March 2005, have been made by CW also
at the direction of law enforcement and with the understanding
that CW will be reimbursed by law enforcement for such payments.

businessman and close associate of Congressman Jefferson, whom Jefferson intends to name as the Chief Executive Officer of iGate.  Congressman Jefferson described to CW what his role would be with regard to the board:  "I'm in the shadows, behind the curtain."[16]

## VI.  PROBABLE CAUSE THAT EVIDENCE OF THE OFFENSES DESCRIBED HEREIN WILL BE FOUND AT CONGRESSMAN JEFFERSON'S WASHINGTON, D.C. RESIDENCE AND HIS 1990 LINCOLN TOWN CAR

75.  Based upon my training and experience and knowledge of the facts of this investigation, I respectfully submit that there is probable cause to believe that records, fruits and instrumentalities of the offenses cited herein will be found in Congressman Jefferson's Washington, D.C. residence and his 1990 Lincoln Town Car.

76.  The first location to be searched, 1350 F Street, N.E., Washington, D.C., is the residence of Congressman William J. Jefferson.  I have obtained and reviewed home telephone records that reflect Jefferson as the subscriber to that telephone at that address.  I have also learned that an electric utility record reflects Jefferson as the account holder for that address.

---

[16]  On July 21, 2005, CW met with Congressman Jefferson.  At that meeting, Jefferson discussed, among other things, the fact that he was in the process of forming a new company called "Multimedia Broadband Services," with The ANJ Group and CW, among others, to be shareholders.  According to Jefferson, the company was being formed to replace iGate's role in these African business transactions and thereby avoid the negative consequences of iGate's debt structure while controlling iGate's patented technology, which would be transferred to the new company.

Finally, on July 26, 2005, your affiant personally observed a 1990 dark blue Lincoln Town Car with Louisiana tag DUJ043, parked in the driveway of the above-referenced address. A query of the Louisiana Department of Motor Vehicle database revealed this vehicle to be registered to William J. Jefferson, 1922 Marengo Street, New Orleans, Louisiana.

77. I respectfully submit that there is probable cause to believe that evidence related to the criminal offenses discussed herein will be found in Congressman Jefferson's Washington, D.C. residence. For example, monitoring of the Target Telephone has revealed numerous instances of faxes being sent to or from Jefferson's Washington, D.C. residence: June 21, 2005 (fax from Jackson re: iGate patent documents); June 29, 2005 (Jackson faxes proxy agreement related to iGate); and June 29, 2005 (Jackson faxed un-named document). In addition, CW and Congressman Jefferson have discussed the fact that the Congressman has worked out of his Washington, D.C. residence on iGate matters.

78. The second location to be searched is Congressman Jefferson's 1990 Lincoln Town Car. As is discussed in more detail above, on Saturday, July 30, 2005, Congressman Jefferson drove to Arlington, Virginia and met CW at the Ritz-Carlton Pentagon City. At the close of the meeting, CW delivered a briefcase containing $100,000 cash to Congressman Jefferson for further delivery by Jefferson to the Vice President of Nigeria.

Jefferson took the briefcase and placed it in the passenger compartment of his 1990 Lincoln Town Car before driving away from the scene.

79.  Based on my training and experience and knowledge of the facts of this investigation, I know that Congressman Jefferson has occasionally driven his 1990 Lincoln Town Car to meetings with CW at various locations in the Washington, D.C. metropolitan area during the past four months.  I also know that Congressman Jefferson has transported, by way of his 1990 Lincoln Town Car, numerous documents relevant to the Nigerian and Ghanaian business ventures and his efforts at taking over control of iGate because he has brought these documents to meetings with the CW which they have discussed together at those meetings. Based upon my training and experience, I know that people who transport documents while driving an automobile, sometimes leave those documents in their automobile if there is temporarily no other place to put them.

## VII. <u>CONCLUSION</u>

80.  Based upon the foregoing, I respectfully submit that there is probable cause to believe that the above-described Washington, D.C. residence of Congressman William J. Jefferson and his 1990 Lincoln Town Car each contain property constituting evidence of the commission of:  a) bribery of a public official, in violation of Title 18, United States Code, Section 201; b)

wire fraud (scheme or artifice to deprive persons of honest services) in violation of Title 18, United States Code, Sections 1343, 1346 and 1349; c) wire fraud (scheme or artifice to obtain money) in violation of Title 18, United States Code, Sections 1343 and 1349; d) bribery of a foreign official in violation of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-1 et seq., and e) conspiracy to commit bribery, wire fraud, bribery of a foreign official and to defraud the United States with regard to the above-referenced crimes, in violation of Title 18, United States Code, Section 371, and the fruits of crime and property designed or intended for use and which is and has been used as the means of committing the above-described offenses, and those items listed in Schedule B, which is incorporated herein by reference.


_____        _____
                               Timothy R. Thibault
                               Special Agent
                               Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me
this _____ day of August 2005.


_____
UNITED STATES MAGISTRATE JUDGE_____

## SCHEDULE A
(Descriptions of Properties to be Searched)


1.    The real property and premises known as 1350 F
Street, N.E., Washington, D.C. 20002, and any and all
outbuildings, appurtenances, storage areas, locked containers,
associated therewith and automobiles located thereon.

     The premises is more particularly described as a three-story
tan brick row house trimmed in cream.  This residence is located
at the northwest corner of the intersection of F Street, NE, and
Elliot Street, N.E.  On the ground-level of this three-story
building is a one-car garage with a white garage door facing F
Street, N.E.  There are several steps that lead up to the main
entrance, which allows access to the second level of the
residence.  This entrance also faces F Street, N.E.  The main
entrance is secured by a black wooden door, above which are the
numbers "1350."

2.    1990 Blue Lincoln Town Car
      VIN: 1LNLM82F2LY706812
      Louisiana License Plate Number DUJ043

and any and all storage areas, locked containers, associated
therewith and located thereon

## SCHEDULE B

### ITEMS TO BE SEIZED FROM

1350 F STREET, N.E.
WASHINGTON, D.C. 20002

and any and all outbuildings, appurtenances, storage areas,
locked containers, associated therewith and automobiles located
thereon; and

1990 BLUE LINCOLN TOWN CAR
VIN: 1LNLM82F2LY706812
LOUISIANA LICENSE PLATE NO. DUJ043

and any and all storage areas and locked containers, associated
therewith and located thereon.

The following records or information related to evidence of

violations of Title 18, United States Code, Sections 201, 371,

1343, 1346 and 1349 and Title 15, United States Code, Section,

78dd-1, et seq:

A.    records and documents, from January 2001 to the
present, related to the following entities:

1.    IGate, Incorporated, including documents related
to the iGate telecommunications/internet business
ventures proposed for Nigeria and Ghana;
2.    Global Energy & Environmental Services, LLC;
3.    The ANJ Group, LLC;
4.    Rosecom.Net;
5.    NDTV;
6.    EIM;
7.    Multimedia Broadband Services, Inc;
8.    Global Multimedia Broadband Services;
9.    W2 IBBS, Limited; and
10.   IBBS.

B.    records and documents related to communications and/or
correspondence from January 2001 to the present, including:

1.    Congressman Jefferson's June 21, 2005 letter to
the Vice President of Nigeria.

2.    Congressman Jefferson's June 29, 2005 letter to

the Vice President of Ghana.

3.  any communications from Vernon Jackson or Byeong K. Son and to or from any government or telecommunications officials in Ghana or Nigeria;

4.  any communications to or from Congressman William Jefferson and to or from:

    a.  Export-Import Bank of the United States, any of its Officers, Directors, employees and/or former employees (including, but not limited to J. Joseph Grandmaison and Maureen Adu) related to any potential funding or potential loan guarantees for business projects involving iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS in Ghana or Nigeria;

    b.  Vernon Jackson, Byeong K. Son, Brett Pfeffer, Diane Fraker, Norbert Simmons, Edward Kufuor, Jack Swetland and Suleiman YahYah, related to any business projects and/or the restructuring of debts and liabilities, involving iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS;

    c.  Official(s) of the United States Embassies in Ghana or Nigeria, related to any travel to those countries and involving the telecommunications and/or perspective business projects of iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS, in Ghana or Nigeria, including the July 4, 2005 trip by Congressman Jefferson and others to Ghana;

    d.  Official(s) of the Ghanaian or Nigerian Embassies in the United States related to any travel to those countries involving the telecommunications and/or perspective business projects of iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS, in Ghana or Nigeria, including but not limited to the July 4, 2005 trip by Congressman William Jefferson and others to Ghana;

-2-

     e.    Government Official(s) of Nigeria or Ghana related to the telecommunications and/or business projects involving iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS, in Ghana or Nigeria; and

     f.    Government official(s) of Nigeria or Ghana related to any business entity, product or service referencing Vernon Jackson.

C.    records and documents related to travel from January 2004 to the present, by Congressman William Jefferson, Vernon Jackson, Angelle Kwemo, Edward Kufuor, Byeong K. Son, and/or Brett Pfeffer to or from Ghana and/or Nigeria regarding perspective or real business related to iGate, Incorporated, Multimedia Broadband Services, Inc, W2 IBBS, Limited, or IBBS, including:

     1.    receipts and or vouchers related to airline travel, hotel, car, taxi, and/or food;

     2.    vouchers and/or requests for reimbursement for the above-listed expenses;

     3.    travel disclosure forms filed with the Clerk of the House of Representatives; and

     4.    documentation regarding passport and/or visa applications.

D.    records and documents related to appointments, visits and telephone messages to or for Congressman William Jefferson from January 2004 to the present, including:

     1.    visitor sign in books;
     2.    ledgers;
     3.    paper telephone messages, (either printed or handwritten); and
     4.    appointment calendars.

E.    Cash in $100 denominations or higher.

F.    A new, reddish-brown colored leather briefcase retailed or manufactured by Bosca.

G.    A reddish-brown colored cloth bag with two draw strings at the top of the bag, with the light colored letters "BOSCA" located on the side of the bag.

-3-